STATE OF NORTH CAROLINA v. CURTIS RAY WOMBLE

No. 126A94

(Filed 31 July 1996)

**1. Jury § 99 (NCI4th)— death penalty views—reopening examination of passed juror**

The trial court had "good reason" to permit the State to reopen the examination of a prospective juror it had previously passed where the juror's answer to defense counsel's question regarding his feelings about the death penalty was inconsistent with earlier answers he had given to both the prosecutor and the trial court. N.C.G.S. § 15A-1214(g).

**Am Jur 2d, Jury §§ 189 et seq.**

**2. Jury § 219 (NCI4th)— jury selection—death penalty views—dismissal for cause**

It was not error for the trial court to dismiss a prospective juror for cause based on her death penalty views, notwithstanding her statement that she believed in the death penalty, where her responses to questions by the trial court, prosecutor and defense counsel strongly indicated that she personally could not return a recommendation of death, and she was never able to state clearly her willingness to set aside her own beliefs in deference to the rule of law.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**3. Jury § 260 (NCI4th)— peremptory challenge—racially neutral reasons**

The State met its burden of coming forward with neutral, nonracial explanations for its peremptory challenge of a minority prospective juror where the prosecutor stated that the juror was peremptorily excused because he had indicated that he had been rudely treated by an assistant district attorney and because he misunderstood the burden of proof.

**Am Jur 2d, Jury § 244.**

**Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case. 1 ALR2d 1291.**

**Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.**

**Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury— post-*Batson* federal cases. 110 ALR Fed 690.**

**4. Jury § 123 (NCI4th)— capital trial—jury selection—age of defendant as mitigating circumstance—attempt to stake out juror**

The trial court did not err by refusing to permit defense counsel to ask a prospective juror in a capital trial whether he would

consider the age of the defendant to be of any importance in determining the appropriateness of the death penalty since this question was a clear attempt to stake out whether the juror would consider a specific mitigating circumstance.

**Am Jur 2d, Jury §§ 208-210.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**Propriety, on voir dire in criminal case, of inquiries as to juror's possible prejudice if informed of defendant's prior convictions. 43 ALR3d 1081.**

**5. Jury § 123 (NCI4th)— capital trial—jury selection—age of defendant—impermissible hypothetical question**

The trial court did not err in refusing to permit defense counsel to ask a prospective juror in a capital trial whether he understood that the fact defendant was seventeen years old at the time of the commission of the crime was a statutory mitigating circumstance that the jury could consider to make this crime less deserving of the death penalty since the question was hypothetical because no evidence relating to defendant's age had been presented to the jury and the fact that defendant was seventeen years old, standing alone, did not establish the mitigating circumstance of age; and defense counsel may not attempt to indoctrinate prospective jurors as to the existence of a mitigating circumstance, not then known to exist, through the use of hypothetical questions.

**Am Jur 2d, Jury §§ 208-210.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**Propriety, on voir dire in criminal case, of inquiries as to juror's possible prejudice if informed of defendant's prior convictions. 43 ALR3d 1081.**

**6. Criminal Law § 680 (NCI4th)— mitigating circumstance— age of defendant—peremptory instruction not warranted**

Evidence as to the statutory mitigating circumstance of defendant's age at the time of a murder was controverted and did

not warrant a peremptory instruction where there was evidence that the defendant was seventeen years old at the time he committed the crime, was mentally and emotionally young in years, had an unstable home environment, had a learning disability, read at a fourth-grade level, left school after the seventh grade and had judgment and insight skills that were below average, but there was also evidence that the defendant's intellectual functioning, judgment and insight were within the normal range, that defendant formed the intent to assault the victim earlier in the day, that defendant was not coerced by anyone, that defendant was not under duress at the time he murdered the victim, and that defendant instructed his accomplice to return to the crime scene and remove items that might contain defendant's fingerprints. Furthermore, defendant requested and received a peremptory instruction that all of the evidence showed that the defendant was seventeen years old and did not specifically request a different peremptory instruction.

**Am Jur 2d, Criminal Law §§ 603, 628.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Propriety of imposing capital punishment on mentally retarded individuals. 20 ALR5th 177.**

**7. Criminal Law § 1362 (NCI4th)— mitigating circumstance of age—weight—propriety of instruction**

The trial court's instruction to the jury regarding the statutory mitigating circumstance of age did not allow the jury to give the circumstance no weight in violation of *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

**Am Jur 2d, Criminal Law §§ 603, 628.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Propriety of imposing capital punishment on mentally retarded individuals. 20 ALR5th 177.**

**8. Criminal Law § 680 (NCI4th)— mitigating circumstance— peremptory instruction—specific request**

The trial court did not err by failing to give a peremptory instruction on the nonstatutory mitigating circumstance that

nothing was taken from the murder victim's residence where defendant made a general request that peremptory instructions be given as to any uncontroverted mitigating circumstances but made no specific request for a peremptory instruction as to this mitigating circumstance.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

9. **Criminal Law § 881 (NCI4th)— capital sentencing proceeding—jury sequestration if verdict not reached—no coercion of verdict**

The trial court did not coerce a verdict in a capital sentencing proceeding by informing the jury at 5:05 p.m., after the jury had deliberated for about seven hours, that if a unanimous decision was not reached by 9:00 p.m., the jury would retire, be sequestered overnight, and continue deliberations the next day where the foreman reported that the jury was making progress and there was no indication of an impasse at the time the trial court addressed the jury; at no time did the trial court inform the jurors that they would not go home until they "reached a unanimous verdict" or intimate that the jury had to reach a verdict by 9:00 p.m.; the court specifically instructed that it was not trying to put jurors under any time constraints or pressure them in any way; after the jurors returned from their dinner break, the trial court, at defendant's request, instructed the jurors to reconcile their differences but only if such could be done without surrender of honest and conscientious convictions and not for the mere purpose of returning a sentence recommendation; and the jury resumed deliberations at 8:00 p.m. and returned at 8:35 p.m. with a sentencing recommendation.

**Am Jur 2d, Trial § 1602.**

**Effect on verdict in criminal case of haste or shortness of time in which jury reached it. 91 ALR2d 1238.**

**Time jury may be kept together on disagreement in criminal case. 93 ALR2d 627.**

**Instructions urging dissenting jurors in state criminal case to give due consideration to opinion of majority (*Allen* charge)—modern cases. 97 ALR3d 96.**

**10. Constitutional Law § 370 (NCI4th)— death penalty—juvenile defendant—not cruel and unusual punishment**

The imposition of the death penalty for first-degree murder on a seventeen-year-old defendant does not constitute cruel and unusual punishment in violation of the state and federal constitutions.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**11. Criminal Law § 1314 (NCI4th)— capital sentencing—plea discussions with accomplice—inadmissibility**

The trial court did not err by refusing to admit in a capital sentencing proceeding evidence of discussions between the State and defendant's accomplice since the treatment of an accomplice by the criminal justice system is not a proper subject for consideration by a capital jury.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**12. Evidence and Witnesses § 1618 (NCI4th)— tape recording—portions inaudible—audible portions relevant—admissibility**

Although portions of a tape recording of a conversation between defendant and an accomplice were inaudible and unintelligible, the trial court did not err by admitting the tape recording into evidence where other parts of the recording were clearly audible, and the audible portions were relevant under Rule 401 to rebut testimony by defendant's expert in psychology. Furthermore, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice so as to

require its exclusion under Rule 403 where portions of the recording which defendant claims are unduly prejudicial relate to the instant crime. N.C.G.S. § 8C-1, Rules 401, 403.

**Am Jur 2d, Evidence § 1238.**

**Omission or inaudibility of portions of sound recording as affecting its admissibility in evidence. 57 ALR3d 746.**

**Admissibility in evidence of sound recording as affected by hearsay and best evidence rules. 58 ALR3d 598.**

**Admissibility of sound recordings as evidence in federal criminal trial. 10 L. Ed. 2d 1169.**

13. **Criminal Law § 1357 (NCI4th)— mental or emotional disturbance mitigating circumstance—instruction—victim's racial bigotry not precluded as source**

The trial court's instruction that the jurors could find the mental or emotional disturbance mitigating circumstance if they found that defendant suffered from "depersonalization or dissociation" did not preclude the jurors from considering evidence of the victim's acts of racial bigotry as a source of defendant's mental or emotional disturbance where the court also instructed the jury that the mitigating circumstance would exist if "the defendant's mind or emotions were disturbed, from any cause, and . . . he was under the influence of the disturbance when he killed the victim." Even if a juror might have understood the trial court's instruction as precluding consideration of any evidence regarding the victim's acts of racial bigotry in determining the existence of this circumstance, such juror could have considered this evidence in his or her determination of the "catchall" mitigating circumstance.

**Am Jur 2d, Criminal Law § 628.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**14. Criminal Law § 441 (NCI4th)— capital sentencing— jury argument—differences between psychiatrists and psychologists**

The prosecutor did not ridicule the psychologist who testified for defendant or inject his own personal beliefs into the case by statements in his jury argument in a capital sentencing proceeding in which he pointed out differences between practicing psychiatrists and psychologists. Rather, the prosecutor's argument was a fair and accurate interpretation of the evidence, including testimony by defendant's psychologist and by a psychiatrist who testified for the State, and the reasonable inferences that could be drawn therefrom.

**Am Jur 2d, Trial § 695.**

**Propriety and prejudicial effect of counsel's negative characterization or description of witness during summation of criminal trial—modern cases. 88 ALR4th 209.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**15. Criminal Law § 463 (NCI4th)— capital sentencing—jury argument—testimony not misconstrued**

The prosecutor did not misconstrue testimony by defendant's psychologist when he argued to the jury in a capital sentencing proceeding, in effect, that the psychologist had testified on cross-examination that two or more psychologists could interpret a test differently and, as a result, reach differing conclusions as to an individual's personality trait.

**Am Jur 2d, Trial § 632.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**16. Criminal Law § 541 (NCI4th)— juror misconduct—excusal of two jurors—failure to declare mistrial**

The trial court did not abuse its discretion by failing to declare a mistrial following allegations that jurors had engaged in

inappropriate conversations in the jury room where the trial court conducted an inquiry into the alleged misconduct and excused two jurors.

**Am Jur 2d, Trial §§ 1722-1727.**

**Use of intoxicating liquor by jurors: criminal cases. 7 ALR3d 1040.**

**Propriety and effect of jurors' discussion of evidence among themselves before final submission of criminal case. 21 ALR4th 444.**

**Prejudicial effect of jury's procurement or use of book during deliberations in criminal cases. 35 ALR4th 626.**

17. **Criminal Law § 1373 (NCI4th)— murder of elderly man —seventeen-year-old defendant—death penalty not disproportionate**

A sentence of death imposed upon the seventeen-year-old defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases where defendant pled guilty to first-degree murder; the jury found as aggravating circumstances that the murder was especially heinous, atrocious, or cruel and that it was committed for pecuniary gain; the victim was killed in his own home; defendant was the ringleader of a plan with two accomplices to take the victim's money, and he alone entered the victim's home and took the victim's life; the jury failed to find that defendant's age was a mitigating circumstance; defendant rendered the sixty-year-old victim helpless by beating him with his fist, then with a glass object, then with the base of a telephone, and finally with a frying pan; defendant continued the assault even though the victim yelled repeatedly that defendant was going to kill him; the victim suffered great physical and psychological pain before death and was aware of his impending death as he was beaten; and defendant failed to show any remorse for what he had done but instead bragged to his friends and talked about the need to return to the victim's residence to remove any objects containing his fingerprints and to burn the residence to destroy any possible evidence.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that mur-**

der was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.

Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Gore, J., at the 14 February 1994 Special Criminal Session of Superior Court, Columbus County. Heard in the Supreme Court 13 September 1995.

*Michael F. Easley, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 22 March 1993 for first-degree burglary and for the first-degree murder of Palmer Ray Brown. On 13 September 1993, the defendant pled guilty to the first-degree murder charge. Pursuant to the plea agreement, the first-degree burglary charge was dismissed. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death. For the reasons discussed herein, we conclude that the jury selection and the defendant's capital sentencing proceeding were free from prejudicial error, and that the sentence of death is not disproportionate.

At the capital sentencing proceeding, the State presented evidence tending to show that Palmer Ray Brown, the sixty-year-old victim, was murdered on the night of 16 March 1993, and that the defendant confessed to the murder. The defendant, in his confession, stated that he, Jamieka Oliver and Tony Oliver had discussed "messing with" the victim and taking the victim's money. On the night of the murder, the defendant and Jamieka went to the victim's residence. The

defendant entered the residence while Jamieka waited outside. Brown was asleep when the defendant found him. Defendant jumped on top of Brown and began beating him, first with his fist and then with a glass object that was sitting on a shelf behind the bed. The glass object shattered into pieces, so the defendant grabbed the base of a telephone and used it to hit Brown several more times in the head. After the phone slipped out of his hand, the defendant grabbed a frying pan from the shelf and began hitting the victim in the head with the pan. Grease flew out of the pan as the defendant beat the victim.

The defendant stated that throughout the assault, the victim was yelling, "You're going to kill me," but that he did not stop the assault until the victim stopped yelling. After the assault, the defendant searched the victim's pockets and the residence for money but did not find any. As the defendant searched the premises, the victim made "gargling" sounds. Later that evening, defendant told Tony Oliver that he thought he had killed Ray Brown. Defendant also asked Jamieka to go back to the victim's residence to get the frying pan and the telephone because defendant thought that they might have his fingerprints on them. Defendant also stated that he was not intoxicated, and that he had not used any drugs prior to murdering Brown. Defendant stated that he was aware of what he was doing and knew that killing Brown was wrong. Finally, defendant stated that he freely and voluntarily committed the murder.

Dr. Brent Hall, an expert in the field of forensic pathology, performed an autopsy on the victim. The autopsy revealed that the victim suffered numerous external lacerations, bruises and contusions, multiple skull fractures, bruises to the brain and other internal brain injuries. Dr. Hall was able to form the opinion that the victim died as a result of head trauma inflicted by a blunt object. Dr. Hall was also of the opinion that the victim suffered moderate to severe pain as a result of his injuries, and that the victim could have lived for several minutes after receiving the blows to the head.

## JURY SELECTION

[1] In his first assignment of error, the defendant contends that the trial court erred by permitting the State to reexamine a prospective juror whom the State had previously passed. We disagree.

During jury selection, the trial court asked prospective juror James Grange a series of death-qualifying questions. Mr. Grange indi-

cated to the trial court that he would be able to vote for a recommendation of either death or life, that he would base his recommendation on the law and the evidence presented and that he had no prior opinion as to the appropriate punishment in this case. Mr. Grange responded in similar fashion to questions posed by the prosecution. However, when asked by the defendant to describe his general feelings regarding the death penalty, Mr. Grange stated that he believed in life in prison with hard labor. Following examination and acceptance of this juror by the defendant, the prosecution moved to reexamine prospective juror Grange pursuant to N.C.G.S. § 15A-1214(g). The trial court allowed the prosecution's motion, and this prospective juror was thereafter peremptorily excused by the prosecution.

Section 15A-1214(g) of the North Carolina General Statutes permits the trial court to reopen the examination of a prospective juror if, at any time before the jury has been impaneled, it is discovered that the juror has made an incorrect statement or that some other good reason exists. N.C.G.S. § 15A-1214(g) (1988). The decision whether to reopen the examination of a passed juror is within the sound discretion of the trial court. *State v. Rogers*, 316 N.C. 203, 216, 341 S.E.2d 713, 721 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Moreover, once the trial court reopens the examination of a juror, each party has the absolute right to exercise any remaining peremptory challenges to excuse such a juror. *Id.*

After a thorough review of the record, we find that a "good reason" existed for reopening the examination of prospective juror Grange. Mr. Grange's answer to defense counsel's question regarding his feelings about the death penalty was inconsistent with the earlier answers he gave to both the trial court and the prosecution. The only means to assure that Mr. Grange had been forthright in his answers to the trial court and to the prosecution regarding the death penalty was for the trial court to allow further inquiry into Mr. Grange's beliefs regarding capital punishment. The trial court, having "good reason," therefore did not abuse its discretion by reopening Mr. Grange's examination. This assignment of error is overruled.

[2]   In his second assignment of error, the defendant contends that under *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), and *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), it was error for the trial court to dismiss prospective juror Paula Dew for cause based upon her opposition to capital punishment.

In *Witherspoon*, the Supreme Court held that a prospective juror may not be excused for cause simply because he "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 20 L. Ed. 2d at 785. However, a juror may be excused for cause if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52. Further, jurors may be properly excused if they are unable to " 'state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986)).

When initially questioned by the trial court in the case *sub judice*, Ms. Dew stated that, although she believed in capital punishment, she did not know whether she could vote for a recommendation of death. When asked if she could recommend a sentence of death if the State were to convince her personally of all the things the law requires, Ms. Dew responded, "I couldn't do it." During examination by defense counsel, Ms. Dew first indicated that she "couldn't personally hand down the death penalty" and that she "couldn't handle it." However, Ms. Dew later stated that although she did not wish to vote for the death penalty, she would if she had to. Ms. Dew also stated that she would listen to the trial court's instructions and keep an open mind about what her decision would be until she heard all of the evidence and the trial court's instructions. Following a reexplanation of the sentencing process by the prosecutor, Ms. Dew stated that she did not know whether her feelings regarding the death penalty would prevent or substantially impair her ability to sit as a juror in this case. When asked why she could not return a recommendation of death, Ms. Dew responded, "I don't think I could live with myself." Finally, when asked by the trial court if her feelings about the death penalty would interfere with her ability to be a juror, Ms. Dew responded, "Yes." Prospective juror Dew was then excused for cause.

Notwithstanding Ms. Dew's statement that she believed in the death penalty, her responses strongly indicated that she personally could not return a recommendation of death. Ms. Dew was never able to state clearly her willingness to temporarily set aside her own beliefs in deference to the rule of law. This Court has recognized "that a prospective juror's bias may not always be 'provable with unmistakable clarity,' " and in such instances, " 'reviewing courts must defer

to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially.' " *Brogden*, 334 N.C. at 43, 430 S.E.2d at 908 (quoting *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990)). After a thorough review of the exchanges between the trial court, the prosecutor, counsel for the defendant and prospective juror Dew, we cannot say that the trial court abused its discretion in determining that the views of prospective juror Dew would prevent or substantially impair her from performing her duties as a juror. Deferring to the trial court's judgment, we find that the trial court did not err by granting the State's motion and excusing Ms. Dew for cause. This assignment of error is overruled.

[3] In his next assignment of error, the defendant contends that the State exercised its peremptory challenges to exclude prospective minority juror Michael Dancil on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of peremptory challenges to exclude a juror solely on account of his or her race. *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83. The Supreme Court established a three-part test to determine if a prosecutor has impermissibly excluded a juror based on race. First, *the defendant must* establish a *prima facie* case of purposeful discrimination. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88; *State v. Robinson*, 330 N.C. 1, 15, 409 S.E.2d 288, 296 (1991). If the defendant succeeds in establishing a *prima facie* case of discrimination, the burden shifts to the prosecutor to offer a race-neutral explanation for each challenged strike. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88; *State v. Wiggins*, 334 N.C. 18, 31, 431 S.E.2d 755, 763 (1993). Finally, the trial court must determine whether the defendant has proven purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991).

In the case *sub judice*, the prosecutor voluntarily offered race-neutral explanations for excusing prospective juror Dancil. Because the purpose of determining the *prima facie* case is to shift the burden of going forward to the State, the State's offer of race-neutral explanations renders it unnecessary to address whether the defendant met his initial burden of establishing a *prima facie* case of discrimination. *Id.* We proceed, therefore, as if the *prima facie* case had

STATE v. WOMBLE

[343 N.C. 667 (1996)]

been established and turn our attention to the State's reasons for peremptorily challenging prospective juror Dancil.

With regard to prospective juror Dancil, the prosecutor stated:

Your Honor, the reason for exercising a peremptory is that in—is this. Said he had some prior connection with Mr. Kelley [Assistant District Attorney]. And as I understood him to say, he felt that Mr. Kelly had treated him rather rudely. And he also said in response to one of Mr. Kelly's questions that he could vote for the death penalty if it was proved beyond all doubt. And that's a greater burden than is required by law.

Following the prosecution's explanation for exercising its peremptory challenge, the defendant declined the trial court's invitation to make a further showing. Instead, the defendant merely argued that he did not believe the prosecution's explanation was a sufficient reason to excuse prospective juror Dancil. The defendant now argues that the State's proffered explanations were unconvincing and pretextual. We disagree.

In order to rebut a *prima facie* case of discrimination, the prosecution need only articulate legitimate reasons which are clear, reasonable and related to the particular case to be tried. *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). The prosecutor's explanation need not, however, rise to the level justifying a challenge for cause. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. In this case, the prosecutor stated that prospective juror Dancil was excused because Dancil had indicated that he had been rudely treated by the assistant district attorney and because he misunderstood the burden of proof. Although the reasons offered by the prosecution might not justify an excusal for cause, each reason is clear, reasonably specific and related to the particular case to be tried. The prosecutor is not required to provide an explanation that is persuasive, or even plausible. *Purkett v. Elem*, —— U.S. ——, ——, 131 L. Ed. 2d 834, 839 (1995). "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406.

When considered in this light, we believe that the State has met its burden of coming forward with neutral, nonracial explanations for

its peremptory challenge of prospective juror Dancil. This assignment of error is therefore overruled.

**[4]**   In his next assignment of error, the defendant contends that the trial court erred by preventing defense counsel from examining prospective jurors regarding their ability to consider the statutory mitigating circumstance of age.

During jury selection, the defendant attempted to ask the following question to prospective juror Michael Cartrette:

> [DEFENSE COUNSEL]: You mentioned something [awhile] ago about situations in which you would feel the death penalty might be appropriate, or—or not be considered. Would you consider the age of the defendant to be of any importance in this case?

The prosecution objected to the defendant's question, and the trial court sustained the objection.

This Court has consistently held that "a defendant may not use *voir dire* to stake out potential jurors by asking whether they could consider specific mitigating circumstances during the sentencing phase." *State v. Miller*, 339 N.C. 663, 680, 455 S.E.2d 137, 146, *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 169 (1995). General questions, such as the prospective jurors' ability to follow instructions relating to mitigating circumstances, are permissible. *Id.* Defendant's question to prospective juror Cartrette, however, was a clear attempt to stake out whether the juror could consider a specific mitigating circumstance. The trial court did not abuse its discretion by refusing to allow defendant to ask such a question.

**[5]**   Later, during the *voir dire* of prospective juror Robert Norris, defendant asked the following:

> [DEFENSE COUNSEL]: [Do] you understand that Mr. Womble's age, of being 17 years old at the time of the commission of the crime is a statutory mitigating factor? That means that it's a factor that you could consider, that the jury could consider making this crime less deserving of the death penalty. Do you understand that that is the case?

The prosecution similarly objected to this question, and the trial court sustained the objection.

This Court has also consistently held that a defendant may not attempt to indoctrinate prospective jurors regarding the existence of

a mitigating circumstance, not then known to exist, through the use of hypothetical questions. *State v. Skipper*, 337 N.C. 1, 21, 446 S.E.2d 252, 262 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995); *Davis*, 325 N.C. at 621, 386 S.E.2d at 425. At the time defendant's question was asked, the jury had not been instructed regarding specific mitigating circumstances. Moreover, no evidence relating to the defendant's age had been presented to the jury other than the statement by defense counsel that defendant was seventeen years old at the time the offense was committed. Standing alone, the fact that defendant was seventeen years old does not establish the existence of the mitigating circumstance of age. "The mitigating circumstance of defendant's age may not be determined solely by reference to defendant's chronological age at the time of the crime, but rather it must be determined in light of 'varying conditions and circumstances.' " *State v. Gregory*, 340 N.C. 365, 422, 459 S.E.2d 638, 671 (1995) (quoting *State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986)), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996). The defendant's question, therefore, was hypothetical and was properly disallowed by the trial court. This assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

**[6]** In his next assignment of error, the defendant contends that the trial court erred by refusing to give a peremptory instruction on the statutory mitigating circumstance of defendant's age at the time the crime was committed. N.C.G.S. § 15A-2000(f)(7) (Supp. 1995).

A capital defendant is entitled to a peremptory instruction when a mitigating circumstance is supported by uncontroverted evidence. *State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979). Conversely, a defendant is not entitled to a peremptory instruction when the evidence supporting a mitigating circumstance is controverted.

Chronological age standing alone is not determinative of the existence of the (f)(7) mitigating circumstance. *Skipper*, 337 N.C. at 47, 446 S.E.2d at 277. "The mitigating circumstance of defendant's age may not be determined solely by reference to defendant's chronological age at the time of the crime, but rather it must be determined in light of 'varying conditions and circumstances.' " *Gregory*, 340 N.C. at 422, 459 S.E.2d at 671 (quoting *Johnson*, 317 N.C. at 393, 346 S.E.2d at 624). In this case, there was evidence that the defendant was seventeen years old at the time he committed the crime, was mentally and emotionally young in years, had an unstable home environment, had

a learning disability, read at a fourth-grade level, left school after the seventh grade and had judgment and insight skills that were below average. However, there was also evidence that the defendant's intellectual functioning, judgment and insight were within the normal range. Additionally, there was evidence that the defendant had previously assaulted the victim, that defendant formed the intent to assault the victim earlier in the day, that defendant was not coerced by anyone, that defendant was not under duress at the time he murdered the victim and that defendant instructed his accomplice to return to the crime scene and remove items that might contain defendant's fingerprints. Based on these facts, we find that the evidence as to the (f)(7) mitigating circumstance was controverted and did not warrant a peremptory instruction.

Furthermore, the defendant requested and received a peremptory instruction that all of the evidence showed that the defendant was seventeen years old. The defendant failed to object to the trial court's peremptory instruction, indicate dissatisfaction with the trial court's peremptory instruction or request a different peremptory instruction on age. As the defendant did not specifically request a different peremptory instruction, the trial court did not err by failing to give such an instruction. *See Skipper*, 337 N.C. at 41, 446 S.E.2d at 274. This assignment of error is accordingly overruled.

**[7]** In a related argument, the defendant contends that the trial court's instruction to the jury regarding the statutory mitigating circumstance of age allowed the jury to give the circumstance no weight in violation of *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1 (1982). The identical argument has been considered previously and rejected. *See Skipper*, 337 N.C. at 45-47, 446 S.E.2d at 277. We find no compelling reason to depart from our prior holding and conclude that the trial court did not err in its instruction. This assignment of error is overruled.

**[8]** In his next assignment of error, the defendant contends that the trial court erred by refusing to give a peremptory instruction on the nonstatutory mitigating circumstance that nothing was taken from the victim's residence. We find no merit in the defendant's argument.

Before the defendant will be entitled to a peremptory instruction upon a mitigating circumstance, he must specifically request a peremptory instruction. *Skipper*, 337 N.C. at 41, 446 S.E.2d at 274. In *Skipper*, the defendant made a written request that peremptory instructions be given as to each mitigating circumstance submitted to

the jury. However, when the trial court questioned defendant as to this request, defendant specifically requested peremptory instructions on only two of the mitigating circumstances submitted. This Court found no error in the trial court's failure to give peremptory instructions on all the uncontroverted mitigating circumstances, stating that "the trial judge did not err when he gave peremptory instructions pursuant only to defendant's specific request." *Id.* at 42, 446 S.E.2d at 275.

In the case *sub judice*, the defendant made a general request that peremptory instructions be given as to any uncontroverted mitigating circumstances. However, the defendant failed to make a specific request that a peremptory instruction be given as to *this* mitigating circumstance. As in *Skipper*, the trial court did not err by failing to give a peremptory instruction where defendant failed to specifically request such an instruction. This assignment of error is overruled.

**[9]** In his next assignment of error, the defendant contends that the trial court coerced a jury verdict by ordering that the jury be sequestered if it did not reach a sentencing recommendation before a 9:00 p.m. deadline.

The jury began its deliberations at 10:25 a.m. and, with the exception of a lunch break, continued its deliberations throughout the afternoon. At 5:05 p.m., the trial court called the jury into the courtroom and asked the jury foreman whether the jury was still making progress. The jury foreman answered affirmatively. The trial court then addressed the jurors as follows:

> Now, ladies and gentlemen, I'd like to tell you what my proposed schedule is, because at some point you may—some of you may need to contact your families.

> It is now five o'clock. I propose to let you folks continue your deliberations until about six o'clock. At six o'clock you will go for your dinner. That again will be provided for you by the State, and you will be kept together during your dinner hour.

> I will then bring you back here to continue your deliberations. If you have not reached a unanimous recommendation by nine o'clock, at that point we will put all of you up for the night in one of the local motels. You will not be allowed to go home.

> So, those of you who need to should go ahead and start making arrangements with the bailiffs to make phone calls to notify

your families. And of course you're going to need some supplies including toiletries and what other items you may need to spend the night.

So, I tell you that. We will give you a chance to do that. If any of you want to call now, to go ahead and begin making those preparations, that's fine. And I am not assuming that you will not reach a unanimous recommendation before nine o'clock tonight. I have no way of knowing, and so we have to prepare for that.

And I want you to understand I'm not trying to put you under any time constraints or pressure you in any way, but at the same time because of the very serious nature of your deliberations, at this point, I will not let you return home. You will remain together, and in the presence of a sheriff's deputy until there is a—a conclusion to this case.

Do any of you have any questions you need to ask?

All right. Do any of you wish to make a phone call at this point, before you go back in for further deliberations?

After the jurors returned from their dinner break, at the defendant's request, the trial court instructed the jury:

Now, ladies and gentlemen, before you go back to your jury room to continue your deliberations, I want to emphasize the fact that it is your duty to do whatever you can to reach a sentence recommendation in this case. You should reason the matter over together, as reasonable men and women, and reconcile your differences if you can, without the surrender of conscientious convictions. But no juror should surrender his or her honest conviction as to the weight or effect of the evidence, solely because of the opinion of his or her fellow jurors, or for the mere purpose of returning a sentence recommendation.

I will now let you resume your deliberations and see if you can reach a unanimous recommendation as to sentence in this matter.

Following this instruction, the jury retired to the jury room at 8:00 p.m. to continue deliberations. At 8:35 p.m., the jury returned with a sentencing recommendation.

Defendant argues that the trial court coerced the jury into reaching a verdict by (1) ordering that the jury be sequestered and inform-

STATE v. WOMBLE

[343 N.C. 667 (1996)]

ing the jurors that they would not be able to go home until they reached a verdict; (2) providing late notice to the jury of the sequestration order; (3) failing to discuss the sequestration order with the jurors to ensure that the sequestration would not cause any undue hardship; and (4) imposing a 9:00 p.m. deadline, at which time the trial court would stop deliberations and hold the jurors overnight.

"[I]t has long been the rule in this State that in deciding whether a court's instructions force a verdict . . . an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury." *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (1985). When viewed in this light, we find no merit to the defendant's arguments.

The jury in the instant case deliberated for approximately seven hours before reaching its sentencing recommendation. This is not an inordinately long period of time considering that the capital sentencing proceeding lasted more than two weeks and required the jury to consider two aggravating circumstances and fifteen mitigating circumstances. At the time the trial court addressed the jury, there was no indication of an impasse; rather, the foreman reported that the jury was making progress and moving forward with its deliberations. At no time did the trial court inform the jurors that they would not be able to go home until they "reached a unanimous verdict." The trial court only informed the jurors that they would remain together until there was a "conclusion to this case." The trial court did not intimate to the jury that it had to reach a unanimous verdict by 9:00 p.m. To the contrary, the trial court specifically instructed the jury, "I want you to understand I'm not trying to put you under any time constraints or pressure you in any way." The trial court's clear message was that if a unanimous decision was not reached by 9:00 p.m., the jury would retire, be sequestered overnight and continue deliberations the next day. The imparting of this information to the jury at this time of normal adjournment was a courtesy and proper courtroom and jury management by the trial court. At this time of the day, the jury was entitled to know the court's proposed schedule and to react thereto. Further, the trial court instructed the jurors to reconcile their differences but only if such could be done without the surrender of honest and conscientious convictions and not for the mere purpose of returning a sentence recommendation. This portion of the trial court's instruction conveyed to the jurors that they were not to sacrifice their individual beliefs in order to reach a verdict. Based on these circumstances, we hold that the trial court's proposed sequestration order

and subsequent instructions were not coercive in any manner. This assignment of error is overruled.

**[10]** The defendant next contends that his sentence of death must be vacated and a life sentence imposed because the execution of juveniles constitutes cruel and unusual punishment in violation of the United States and North Carolina Constitutions. The defendant's argument is without merit.

This Court has repeatedly held that the North Carolina death penalty statute, which provides that a person seventeen years old or older who commits first-degree murder may be sentenced to death, is not unconstitutional. *Skipper*, 337 N.C. at 58, 446 S.E.2d at 284. Further, the United States Supreme Court has held that the imposition of capital punishment on an individual for a crime committed at sixteen or seventeen years of age does not constitute cruel and unusual punishment under the Eighth Amendment. *Stanford v. Kentucky*, 492 U.S. 361, 380, 106 L. Ed. 2d 306, 325 (1989). Accordingly, this assignment of error is overruled.

**[11]** By another assignment of error, the defendant contends that the trial court erred by sustaining the State's objection to the admission of evidence regarding plea bargain discussions between the State and defendant's accomplice, Tony Oliver. We disagree. This Court has held that the treatment of an accomplice by the criminal justice system is not a proper subject for consideration by a capital jury. *See State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). The defendant requests that this Court reconsider its prior decisions in light of *Parker v. Dugger*, 498 U.S. 308, 112 L. Ed. 2d 812 (1991). This Court has previously considered and rejected this argument in *State v. Ward*, 338 N.C. 64, 114-15, 449 S.E.2d 709, 737 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 1013 (1995). We find no compelling reason to depart from our prior holding and conclude that the trial court did not err by sustaining the State's objection. This assignment of error is overruled.

**[12]** In his next assignment of error, the defendant contends that the trial court erroneously admitted into evidence a tape recorded conversation between the defendant and his accomplice, Jamieka Oliver. Defendant specifically contends that the recording was erroneously admitted on two grounds. First, defendant argues that the recording was not competent because parts of it were inaudible or unintelligible. Second, defendant argues that the recording should have been excluded under N.C.G.S. § 8C-1, Rules 401 and 402 as irrel-

evant or, in the alternative, Rule 403 because the prejudicial effect of the recording substantially outweighed its probative value because of the likelihood that violent acts unrelated to the instant crime were discussed therein.

In *State v. Lynch*, 279 N.C. 1, 17, 181 S.E.2d 561, 571 (1971), this Court held that a tape recording, if audible and properly authenticated, is admissible into evidence. Whether a tape recording is sufficiently audible to be admitted is a matter left to the discretion of the trial court. *State v. Williams*, 334 N.C. 440, 459, 434 S.E.2d 588, 599 (1993), *judgment vacated on other grounds*, —— U.S. ——, 128 L. Ed. 2d 42 (1994). Moreover, " 'a tape recording should not be excluded merely because parts of it are inaudible if there are other parts that can be heard.' " *Id.* (quoting *Searcy v. Justice*, 20 N.C. App. 559, 565, 202 S.E.2d 314, 317-18, *cert. denied*, 285 N.C. 235, 204 S.E.2d 25 (1974)).

While portions of the tape recording in the case *sub judice* were inaudible, the tape was sufficiently audible to be admissible. After listening to the tape recording, the trial court specifically found as fact that although there were significant portions of the tape which were inaudible and were not intelligible, there were other parts of the tape which were "very clear and extremely intelligible and audible to the court." Further, the trial court found as fact that significant portions of the tape were highly probative regarding the validity of the opinion rendered by defendant's expert witness. Defendant did not assign error to the trial court's findings of fact. These findings of fact are therefore binding on this Court. *See State v. Lane*, 334 N.C. 148, 154, 431 S.E.2d 7, 10 (1993). Based on the trial court's findings of fact and our own review of the tape recording, we cannot conclude as a matter of law that the trial court abused its discretion by admitting the tape into evidence.

Similarly, we find that the tape recording was relevant and admissible under Rules 401 and 402, and was not unfairly prejudicial under Rule 403.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Dr. John Warren, a psychologist, testified that at the time of the crime, defendant exhibited the phenomena of "dissociation" and "depersonalization," which refer to the psychological response to trauma of removing oneself

emotionally from the situation and experiencing a traumatic situation as though it were an out-of-body experience or happening to someone else. Dr. Warren further testified that the defendant felt remorse for what he had done. The trial court found that significant portions of the tape recording were highly probative regarding the validity of Dr. Warren's testimony. Therefore, the tape recording was relevant under Rule 401 to rebut the testimony of Dr. Warren. Relevant evidence is generally admissible. N.C.G.S. § 8C-1, Rule 402 (1992).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1992). Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court and will only be reversed upon a showing that the trial court's ruling was manifestly unsupported by reason or was so arbitrary that it could not have been the result of a reasoned decision. *Williams*, 334 N.C. at 460, 434 S.E.2d at 600. After reviewing the tape recording and considering it in context with the other evidence presented in this case, we find that portions of the recording which defendant claims are unduly prejudicial clearly relate to the instant crime. The admission of evidence implicating the defendant is by its nature prejudicial. However, we cannot say that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice or that the trial court abused its discretion by admitting such evidence. This assignment of error is therefore overruled.

[13] In his next assignment of error, the defendant contends that the trial court erroneously limited the scope of the (f)(2) mitigating circumstance.

The trial court instructed the jury as follows:

[C]onsider whether this murder was committed while the defendant was under the influence of mental or emotional disturbance.

A defendant is under such influence if he is in any way affected or influenced by a mental or emotional disturbance at the time he kills. Being under the influence of mental or emotional disturbance is similar but not the same as being in [the] heat of passion upon adequate provocation. A person may be under the influence of mental or emotional disturbance even if he had no adequate provocation and even if his disturbance was not so strong as to constitute heat of passion or preclude deliberation. For this mitigating circumstance to exist, it is enough that

the defendant's mind or emotions were disturbed, from any cause, and that he was under the influence of the disturbance when he killed the victim.

You would find this mitigating circumstance if you find that at the time of the murder the defendant, Curtis Womble, suffered from a condition known as depersonalization or dissociation, and that as a result the defendant was under the influence of mental or emotional disturbance when he killed the victim.

The defendant argues that the trial court's instruction precluded the jurors from considering evidence of the victim's acts of racial bigotry as a source of defendant's mental or emotional disturbance by instructing the jury that it should find the (f)(2) mitigator only if it found that the source of the defendant's mental or emotional disturbance was the condition of "depersonalization or dissociation." We disagree.

Unquestionably, the trial court instructed the jurors that they could find the (f)(2) mitigating circumstance if they found that the defendant suffered from "depersonalization or dissociation." However, the trial court also instructed the jury that the mitigating circumstance would exist if "the defendant's mind or emotions were disturbed, from *any cause*, and that he was under the influence of the disturbance when he killed the victim." (Emphasis added.) Although the trial court's instruction did not review the evidence or specifically instruct the jury that it could consider evidence of the victim's alleged racial bigotry, the trial court's instruction in no manner precluded the jurors from considering such evidence.

Assuming *arguendo* that a juror might have understood the trial court's instruction as precluding the consideration of any evidence regarding the victim's acts of racial bigotry, we would still find no merit to the defendant's argument, as any such juror could have considered such evidence in his or her determination of the existence of the "catchall" circumstance. *See State v. Payne*, 337 N.C. 505, 529, 448 S.E.2d 93, 107 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995). We note that the jury considered and rejected the "catchall" mitigating circumstance found in N.C.G.S. § 15A-2000(f)(9). This assignment of error is therefore overruled.

The defendant next contends that the trial court erred on two separate occasions during closing arguments by allowing the prose-

cutors to ridicule defendant's expert witness and misconstrue the expert's testimony.

It is well established that control of counsel's arguments is left to the sound discretion of the trial court. *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979). Prosecutors are given wide latitude in the scope of their argument. *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). "Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence." *Johnson*, 298 N.C. at 368, 259 S.E.2d at 761. Counsel may, however, argue to the jury the law, the facts in evidence and all reasonable inferences drawn therefrom. *Syriani*, 333 N.C. at 398, 428 S.E.2d at 144.

**[14]** In light of these principles, the defendant first contends that the trial court committed plain error by failing to act *ex mero motu* and instruct the jury to disregard the following statement by prosecutor Britt:

> We had two doctors that testified for the defense—or let me back up. We had one doctor. When I use the word doctor I associate that with a medical person. And we had one Ph.D. You had Dr. Groce and you had Mr. Warren. Dr. Groce was a medical doctor. His is by education. He has no special medical training. Dr. Groce deals in science. Mr. Warren deals in theory, the abstract. He deals with hard—Dr. Groce deals with hard, cold facts. He's the one who's received the training to determine whether or not someone knows right from wrong, what their intellectual ability is.

Defendant argues that the prosecutor's speculations about the differences between psychiatry and psychology were without foundation in the evidence and ridiculed Dr. Warren's professional credentials in an unjustified and unprofessional manner.

We note for purposes of our review that the defendant failed to object to the prosecutor's argument above. "When no objections are made at trial . . . the prosecutor's argument is subject to limited appellate review for gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu*." *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996). When determining whether the prosecutor's remarks are grossly improper,

STATE v. WOMBLE

[343 N.C. 667 (1996)]

the remarks must be viewed in context and in light of the overall factual circumstances to which they refer. *Id.* Further, the remarks "must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *Johnson*, 298 N.C. at 369, 259 S.E.2d at 761.

In the case *sub judice*, Dr. James Groce testified that he was a physician practicing in psychiatry; that he graduated from medical school; and that when evaluating people sent to him by the courts, a series of scientific tests are performed in addition to psychological and intellectual testing. Dr. Warren, on the other hand, testified that he was not a medical doctor; that he had a Ph.D. in psychology; and that while psychiatrists are medical doctors and can prescribe medications, psychologists focus more on psychotherapy and educational testing and approach their analysis from a "research science point of view."

Review of this evidence supports the challenged argument. When read in context, the prosecutor did not ridicule Dr. Warren, but merely pointed out the differences between practicing psychiatrists and psychologists. Further, the prosecutor did not inject his own personal opinion into the case. The prosecutor's argument was a fair and accurate interpretation of the evidence and the reasonable inferences that could be drawn therefrom. We therefore find no impropriety with the prosecutor's argument in this regard and no error with the trial court's decision not to intervene to prevent this argument.

[15] The defendant next contends that in his closing argument, prosecutor Kelly attacked Dr. Warren by misconstruing Dr. Warren's testimony as follows:

MR. KELLY: Mr. Britt asked [Dr. Warren], Mr. Britt asked him, "Isn't it true, Doctor, that when you put three psychologists together and you examine one man, each one of you at different times, isn't it entirely possible that each of you is going to come up with something different?" Yes. Yes. That's because what he's talking about, folks, up here is not a science, it's an art. Educated, I would argue to you, guesswork.

[DEFENSE Counsel]: Objection.

COURT: Overruled.

The defendant specifically argues that the above argument misstated both Mr. Britt's question on cross-examination and Dr. Warren's response.

On cross-examination, Dr. Warren testified that the Termatic Appreciation Test ("TAT") which he performed on the defendant is subject to various interpretations and that there is a risk that two or more psychologists giving the same test could interpret the results differently. A fair interpretation of Dr. Warren's testimony, therefore, is that two or more psychologists could interpret a test differently and, as a result, reach differing conclusions as to an individual's personality trait. When read in context, Mr. Kelly's remarks did not misrepresent Dr. Warren's testimony and fall well within the wide latitude afforded counsel in the scope of their argument. Therefore, the trial court did not abuse its discretion by failing to sustain the defendant's general objection to the prosecutor's argument. This assignment of error is overruled.

[16]   The defendant next argues that the trial court erred by failing to declare a mistrial during trial on the basis of juror misconduct following allegations that jurors had engaged in inappropriate conversation in the jury room. The trial court conducted an inquiry into the alleged misconduct and excused two jurors. Defendant fails to submit any compelling argument or authority in support of his contention that the trial court erred by failing to declare a mistrial and therefore waives this argument. Regardless, a careful review of the record indicates that the trial court made an appropriate inquiry and took corrective action to remedy this matter. We find no abuse of discretion in the trial court's decision not to declare a mistrial. This assignment of error is overruled.

## PRESERVATION ISSUES

The defendant raises ten issues which he concedes have been decided against his position by this Court: (1) the trial court erred by failing to submit three nonstatutory mitigating circumstances regarding the favorable treatment afforded defendant's accomplices; (2) the trial court erred by giving an instruction on the burden of proof applicable to mitigating circumstances that was too vague to be understood by jurors; (3) the trial court erred by instructing the jurors that they could reject nonstatutory mitigating circumstances on the grounds that the circumstances had no mitigating value; (4) the trial court erred by instructing jurors that they "may" rather than "must" consider mitigating circumstances found in Issues II, III and IV on the

"Issues and Recommendation as to Punishment" form; (5) the trial court erred by instructing the jurors that they could consider at Issues III and IV only mitigating circumstances which the juror himself or herself found at Issue II; (6) the trial court erred by instructing the jury that at Issue III, a death sentence may be imposed unless the mitigating circumstances outweigh the aggravating circumstances; (7) the trial court erred by instructing the jury on the "especially heinous, atrocious, or cruel" aggravating circumstance because the instruction was unconstitutionally vague; (8) the trial court erred by denying defendant's pretrial motion requesting permission to examine jurors regarding their feelings regarding parole eligibility; (9) the trial court erred by giving an ambiguous instruction as to unanimity regarding Issues III and IV on the "Issues and Recommendation as to Punishment" form; and (10) the trial court erred by dividing prospective jurors into panels and exhausting one panel before any juror from the next panel was called to the box. We have considered the defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule each of these assignments of error.

## PROPORTIONALITY REVIEW

Having found no error in the capital sentencing proceeding, we are required by statute to review the record and determine (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether passion, prejudice, or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). After thoroughly reviewing the record, transcript and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544

(1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We defined the pool of cases for proportionality review in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), and we compare the instant case to others in the pool that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

**[17]** In the case *sub judice*, the defendant pled guilty to the offense of first-degree murder. At sentencing, the trial court submitted two aggravating circumstances, each of which the jury found: that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). The trial court submitted five statutory mitigating circumstances, of which the jury found two: that the defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); and that defendant aided in the apprehension of another capital felon, N.C.G.S. § 15A-2000(f)(8). The jury also found the following nonstatutory mitigating circumstances: (1) that the defendant admitted his guilt, (2) that the relationship between the defendant and the victim was extenuating, (3) that the defendant acknowledged his wrongdoing at an early stage of the criminal process, (4) that the defendant has been a person of good character and reputation in the community, (5) that the defendant was raised under undesirable and deprived circumstances, and (6) that the defendant did not plan to murder the victim when he went to the victim's residence. The jury specifically declined to find the defendant's age as a statutory mitigating circumstance or that the defendant committed the murder while under the influence of a mental or emotional disturbance. The jury also failed to find the statutory catchall mitigating circumstance.

This case has several distinguishing characteristics: the victim's brutal murder was found to be especially heinous, atrocious, or cruel; the victim was killed in his own home; the victim suffered great physical and psychological pain before death; the victim was not only in pain, but aware of his impending death as he was beaten; the victim was of unequal physical strength to defendant; the defendant failed to

exhibit remorse after the killing; and finally, the jury found the existence of more than one aggravating circumstance. These characteristics distinguish this case from those in which we have held the death penalty disproportionate.

In our proportionality review, it is proper to compare the present case to those cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* ‒‒ U.S. ‒‒, 129 L. Ed. 2d 895 (1994). "Of the cases in which this Court has found the death penalty disproportionate, only two involved the 'especially heinous, atrocious, or cruel' aggravating circumstance. *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983)." *Syriani,* 333 N.C. at 401, 428 S.E.2d at 146-47. Neither *Stokes* nor *Bondurant* is similar to this case.

In *Stokes,* the defendant and a group of coconspirators robbed the victim's place of business. No evidence showed who the "ringleader" of the group was. This Court vacated the sentence of death because the defendant was only a teenager and it did not appear that defendant Stokes was more deserving of death than an accomplice, who was considerably older and received only a life sentence. *Stokes,* 319 N.C. at 21, 352 S.E.2d at 664. In the present case, the defendant was the "ringleader," and he alone entered the victim's residence and took the victim's life. Although both defendant Stokes and the defendant in this case were only seventeen years old at the time of their crimes, unlike in *Stokes,* the jury in the present case failed to find that the defendant's age was a mitigating circumstance. Finally, in *Stokes,* the victim was killed at his place of business. In this case, the victim was killed in his home. A murder in one's home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown,* 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

In *Bondurant,* the victim was shot while riding with the defendant in a car. *Bondurant* is distinguishable because the defendant immediately exhibited remorse and concern for the victim's life by directing the driver to go to the hospital. The defendant also went into the hospital to secure medical help for the victim, voluntarily spoke with police officers, and admitted to shooting the victim. In the present case, by contrast, the defendant rendered the victim helpless by beating him first with his fist, and then with a glass object, then with

**STATE v. WOMBLE**

[343 N.C. 667 (1996)]

the base of a telephone and finally with a frying pan. The defendant continued his assault even as the victim yelled repeatedly, "You're going to kill me." Instead of seeking aid for his victim, the defendant chose to take the victim's life and then leave the scene. Finally, the defendant failed to show any remorse over what he had done. Instead, defendant bragged to his friends and talked about the need to return to the victim's residence in order to remove any objects containing his fingerprints and to burn down the residence to destroy any possible evidence.

As noted above, one distinguishing characteristic of this case is that two aggravating circumstances were found by the jury. Of the seven cases in which this Court has found a sentence of death disproportionate, including *Stokes* and *Bondurant*, in only two, *Bondurant* and *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), did the jury find the existence of multiple aggravating circumstances. *Bondurant*, as discussed above, is clearly distinguishable. In *Young*, this Court focused on the failure of the jury to find the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance. The present case is distinguishable from *Young* in that one of the two aggravating circumstances found by the jury was that the murder was especially heinous, atrocious, or cruel.

For the foregoing reasons, we conclude that each case where this Court has found a sentence of death disproportionate is distinguishable from the case *sub judice*.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude the present case is more similar to certain cases in which we have found the sentence of death proportionate than those in which we have found the sentence of death disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Finally, we noted in *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995), that similarity of cases is not the last word on the subject of proportionality. Similarity "merely serves as an initial point of inquiry." *Id.; see also Green*, 336 N.C. at 198, 443 S.E.2d at 46-47. The issue of

whether the death penalty is proportionate in a particular case ulti-
mately rests "on the experienced judgment of the members of this
Court, not simply on a mere numerical comparison of aggravators,
mitigators, and other circumstances." *Daniels*, 337 N.C. at 287, 446
S.E.2d at 325.

Based on the nature of this crime, and particularly the distin-
guishing features noted above, we cannot conclude as a matter of law
that the sentence of death was excessive or disproportionate. We
hold that the defendant received a fair sentencing proceeding, free of
prejudicial error.

NO ERROR.